1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,      : 22-CR-208(CBA)
 4                                  :
                                    :
 5                                  :
          -against-                 : United States Courthouse
 6                                  : Brooklyn, New York
                                    :
 7                                  :
     QING YU, ANTONY ABREU, and     : August 28, 2023
 8   ZHE ZHANG,                     : 2:00 p.m.
                                    :
 9            Defendants.           :
                                    :
10
     - - - - - - - - - - - - - X
11
     REDACTED TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
12            BEFORE THE HONORABLE CAROL BAGLEY AMON
           UNITED STATES SENIOR DISTRICT COURT JUDGE
13

14   A P P E A R A N C E S:

15   For the Government:  BREON PEACE
                          United States Attorney
16                        Eastern District of New York
                               271 Cadman Plaza East
17                             Brooklyn, New York 11201
                          BY:  DEVON LASH
18                        BY:  NADIA MOORE
                          BY:  GABRIEL PARK
19                             Assistant United States Attorneys

20   For the Defendant    LAW OFFICE OF JAMES KOUSOUROS
     Qing Yu:                  260 Madison Avenue, 22nd Floor
21                             New York, New York 10016
                          BY:  JAMES KOUSOUROS, ESQ.
22

23

24

25
```

```
                          Proceedings                        2

1    For the Defendant       SUSAN G. KELLMAN
     Antony Abreu:              25 Eighth Avenue
2                               Brooklyn, New York 11217
                             BY:  SUSAN KELLMAN, ESQ.
3
                             MOSKOWITZ COLSON GINSBERG & SCHULMAN, LLP
4                               80 Broad Street, 19th Floor
                                New York, New York 10004
5                            BY:  EYLAN SCHULMAN, ESQ.

6    For the Defendant       MEISTER SEELIG & FEIN LLP
     Zhe Zhang:                 125 Park Ave, 8th Floor
7                               New York, New York 10017
                             BY:  HENRY MAZUREK, ESQ.
8
                             BY:  JASON SER, ESQ.
9
                             JOEL S. COHEN, P.C.
10                              75 Maiden Lane, Suite 607
                                New York, New York 10013
11                           BY:  JOEL COHEN, ESQ.

12

13   Court Reporter:  Michele Lucchese, Official Court Reporter
                      225 Cadman Plaza, 373N
14                    Brooklyn, New York 11201
                      718-613-2272
15                    E-mail:  MLuccheseEDNY@gmail.com

16   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

17

18

19

20

21

22

23

24

25
```

Proceedings                                                    3

1          THE COURTROOM DEPUTY:  Good afternoon.  This is

2    criminal cause for a status conference, 22-CR-208, U.S.A.

3    versus Yu, et al.

4          Will the parties please state your name, starting

5    with the Government.

6          MS. LASH:  Good afternoon, Your Honor.  Devon Lash,

7    Gabriel Park, Nadia Moore on behalf of the Government.

8          MR. KOUSOUROS:  James Kousouros on behalf of Qing

9    Yu.

10         MS. KELLMAN:  Susan Kellman for Antony Abreu, who is

11   present in court.

12         Good afternoon, Your Honor.

13         THE COURT:  Good afternoon.

14         MR. MAZUREK:  Good afternoon, Your Honor.  Henry

15   Mazurek, Jason Ser, Joel Cohen, all on behalf of Mr. Zhang.

16         THE COURT:  Good afternoon.  Everyone can be seated.

17   There were a series of requests that I thought we should deal

18   with sooner rather than later, and one deals with an

19   application by you, Ms. Kellman, for an additional appointment

20   of counsel to help to assist.

21         MS. KELLMAN:  Yes, Your Honor.

22         THE COURT:  This is made ex-parte, but is there any

23   reason there needs to be?

24         MS. KELLMAN:  No, unless you're going to say no.

25         THE COURT:  Do you mean because the Government

1  opposed it?

2          MS. KELLMAN:  No.

3          THE COURT:  Ms. Kellman has just asked for the Court

4  to authorize the assistance of another CJA attorney.  Well,

5  actually, is this person on the CJA?

6          MS. KELLMAN:  She is not, Your Honor.

7          THE COURT:  Well, now you have -- who is working

8  with you now?

9          MS. KELLMAN:  Myself and Mr. Schulman, and she is an

10 associate at Mr. Schulman's firm.

11         THE COURT:  Why isn't yourself and Mr. Schulman

12 sufficient?

13         MS. KELLMAN:  Given the amount of material in the

14 last few weeks -- we have a paralegal, the paralegal is

15 working around the clock.  We are working around the clock.

16         THE COURT:  Well, Mr. Schulman is being paid as CJA

17 as well, correct?

18         MS. KELLMAN:  Yes, Your Honor.

19         THE COURT:  So three lawyers.

20         MS. KELLMAN:  We are trying to get ready.  Now, if

21 you want to give us more time, we may not need that.  But I

22 didn't leave the house this weekend.  I was reading all

23 weekend.

24         THE COURT:  I think it's a bit unusual to appoint

25 three Criminal Justice Act attorneys to represent one

Proceedings                                    5

1   defendant, so I'm not inclined to do that, unless you are

2   requesting the appointment for a very limited period of time,

3   like two weeks or something, perhaps, but not full-time.

4        MS. KELLMAN:  I could say, Judge, at least until we

5   get ready for trial.  We've literally been going through these

6   materials 24/7 and we haven't gotten the important 3500

7   material.  We have been inundated with phone calls in a

8   different language.

9        THE COURT:  How do I appoint someone who is not on

10  the CJA list?

11       MS. KELLMAN:  Excuse me.  We are asking to have her

12  appointed as associate counsel and their rate is lower.  If

13  Your Honor would be more comfortable, the Court of Appeals has

14  come up with another rate an hour, our paralegal actually

15  is an attorney in the U.K.  So she can't be paid as a lawyer

16  here, but the Circuit approved $90 an hour instead of the

17  normal $65 an hour for a paralegal because she is an attorney.

18       THE COURT:  Is that the same woman?

19       MS. KELLMAN:  No.

20       THE COURT:  Are you asking to have that other person

21  appointed?

22       MS. KELLMAN:  That other person was appointed a

23  while ago.  You appointed her right in the beginning.

24       THE COURT:  As a paralegal?

25       MS. KELLMAN:  Yes.

```
                        Proceedings                      6
```

1           THE COURT:  You're saying appoint Ms. Sochacki as a

2    paralegal at the paralegal rate?

3           MS. KELLMAN:  At the same rate that the other

4    paralegal is getting since Ms. Sochacki is also an attorney.

5           THE COURT:  Here's what I will do, I will appoint

6    her for a period of three weeks.

7           MS. KELLMAN:  Thank you, Judge.

8           THE COURT:  And that's it.

9           MS. KELLMAN:  At the attorney rate or at the

10   paralegal rate?

11          THE COURT:  At the paralegal rate the $90.

12          MS. KELLMAN:  The higher paralegal rate?

13          THE COURT:  Yes.

14          MS. KELLMAN:  Thank you, Judge.

15          THE COURT:  Now, I think the other -- and then you

16   want your paralegal to bring in her cell phone and laptop.

17          MS. KELLMAN:  Yes, Judge.

18          THE COURT:  All right.  I will permit that.

19          And then the two writs that have been requested,

20   have they been approved by the marshals.

21          MR. MAZUREK:  Your Honor, Henry Mazurek on behalf of

22   Mr. Zhang.  Yes, we have conferred with Peter Lee from the

23   U.S. Marshal Service and he responded this weekend that,

24   except for what he said was a spelling error in the word

25   marshal, he is in agreement with the language used.

```
                        Sidebar                        7
```

1        THE COURT:  So this language will work to bring in
2    the two witnesses?
3        MR. MAZUREK:  That's what he said.
4        THE COURT:  Okay.  Then I will use them technically
5    with the technical language.
6        There was another subpoena, I believe, Mr. Mazurek,
7    that you sought.
8        MR. MAZUREK:  Yes.
9        THE COURT:  And I have not signed that as yet.  This
10   is ex-parte.  I just need to talk to you at sidebar and then
11   we will see where we go from there.  If this was filed on
12   behalf of all defense counsel, you are all welcome to join me,
13   but I understood it was just your subpoena, correct?
14       MR. MAZUREK:  We conferred with co-counsel.  It will
15   be used by all defense counsel.
16       (Ex parte sidebar with all defense counsel present.)
17   ████████████  ██████████████████████████████████
18   ████████████████████████████████████████████████████
19   ████████████████████████████████████████████████
20   ████████████████████████████████████████████████
21   ██████████████████████████████████████████████████████
22   ███████████████████████████████████████████████████████
23   ████████████
24         ████████████████████████████████████████
25   ████████████████████████████████████████





Proceedings                                            10

1    ████████████████████████████████████████████████

2    ████████████████████████████████████████████████

3    ███████████████████████

4    ██████████████████████████████████████████

5    ███████████████████████

6    (Sidebar ends; in open court.)

7    THE COURT:  All right.  The record should reflect

8    that the Court just had a conversation with defense counsel

9    and the court reporter present in the absence of the

10   Government because it dealt with an ex-parte request for

11   information, impeachment information or information that they

12   think could likely contain impeaching materials.  It was the

13   telephone conversations and records pertaining to the

14   telephone conversations of two cooperators, David Yu and You

15   You, at the facilities that they are now housed in.

16        I expressed the view to counsel that I had grave

17   concerns about just turning this material over with respect to

18   people who were cooperating with not knowing how that might

19   impact their safety.

20        What I told them I would do and what we would talk

21   about today is the Government obtaining this information and

22   turning it over to defense counsel for the purposes of

23   whatever impeachment material it might contain.

24        So these are at facilities -- counsel believe it

25   could be -- it might be at two different facilities.  I'm

Proceedings                                                    11

1    sorry.  Essex and --

2               MR. KOUSOUROS:  Hudson.

3               THE COURT:  Essex and Hudson.  So rather than

4    signing the subpoena, it was my suggestion that we address

5    this with the Government and have the Government obtain these

6    materials.

7               Is there any reason the Government cannot do that?

8    Otherwise, the only recourse would be to sign the subpoenas

9    that counsel had suggested.

10              MS. LASH:  What information is the defense

11   requesting that we obtain?

12              THE COURT:  Their calls.  The same information you

13   turned over with I guess MDC calls.  So it's just their calls.

14              MS. LASH:  And, I mean, Your Honor, we're directed

15   to provide 3500 material in our possession, which we have

16   turned over all of the telephone calls in our possession.  We

17   don't possess any jail calls at this time from these two

18   individuals, either from Essex or Hudson.  Obviously, we would

19   be concerned with requesting calls and turning them over to

20   the defense not knowing, you know, the safety concerns.

21              THE COURT:  That's what you can -- that was my whole

22   point of raising it with you, which is you can review the

23   material and address the safety concerns as opposed to

24   wholesale turning it over to counsel without those concerns

25   being addressed.  It may well be that you don't have the

Proceedings                                                      12

1    responsibility to obtain this material, although that's not

2    entirely clear.  But if counsel wishes to obtain it, I don't

3    know on what basis they can't obtain it by a subpoena.  It is

4    a little bit like having your cake and eating it too, which is

5    I don't think they should not be able to get it, but I'm not

6    going to get it.

7            MS. LASH:  I understand, Your Honor.  We'll request

8    the telephone calls and review them.

9            Is the directive to provide all calls except for

10   those that concern --

11           THE COURT:  That's what you did with respect to the

12   MDC calls, didn't you?

13           MS. LASH:  No, Your Honor.  If we have a telephone

14   call in our possession, we turn it over.

15           THE COURT:  That's what I mean.  If you get these

16   calls, you would turn it over, unless there was one that

17   impacted safety, like a call to a child saying how are things

18   going at whatever the elementary school is, you know,

19   something like that.

20           MR. MAZUREK:  For the record, Your Honor, we would

21   agree or consent for them to holdback any personal identifying

22   information of family members or people who they are speaking

23   about on the telephone calls.  We are just asking for the

24   content of the statements obviously about their case or things

25   related to their preparation for testimony, those kinds of

Proceedings                                                    13

1    potentially impeach --

2            THE COURT:  Anything related to the case?

3            MR. MAZUREK:  That's correct.

4            THE COURT:  Not, you know, how's dad doing, that

5    sort of thing.

6            MS. LASH:  We understand, Your Honor.  We will try

7    to obtain the calls and produce them promptly.

8            THE COURT:  Okay.  That takes care of that.

9            MR. MAZUREK:  Judge, can we set some kind of

10   timeline on that since we are very close to jury selection?

11           MS. LASH:  Your Honor, we will request them by the

12   end of day tomorrow.  I know that our office has experienced a

13   large lag time in getting calls from one of those facilities.

14   I will communicate the urgency and time sensitiveness of the

15   situation.  The problem with the timeline is, depending on the

16   volume of the calls, we will obviously review them before

17   determining which calls are case related.  So I would ask the

18   Court to allow us to obtain the calls to see the volume before

19   we can set a timeline about turning them over.

20           THE COURT:  I'll tell you what to do, get the calls

21   and then send me a letter telling me what you think the

22   timeline should be or what problems you have in producing

23   them.

24           MS. KELLMAN:  Your Honor, would a subpoena signed by

25   the Court indicating a date perhaps motivate the institution?

Proceedings                                             14

1   It's not BOP.

2          MS. LASH:  We appreciate the suggestion.  We can try

3   to obtain them first.  And if that becomes necessary, we will

4   write to the Court.

5          THE COURT:  Well, you can subpoena them as well as

6   they could have.  If you think that it's important to have a

7   court, if that's going to expedite it, then give me a subpoena

8   and I will sign.

9          MS. LASH:  I understand, Your Honor.

10         MR. KOUSOUROS:  Judge, to the extent that the calls

11  that have already been provided were provided including family

12  calls and so on and so forth, they weren't vetted for that,

13  and given how little time we have, why can't they get them,

14  turn them over to us with a productive order for attorneys'

15  eyes only.

16         THE COURT:  Because then you will tell me that you

17  just got 6,000 calls and you don't have time to go through

18  them all.  I don't know how the process is going to expedite

19  it.  I mean, they said they would go through them and turn

20  over the ones related to the case.  Why are you entitled to

21  anything else other than calls related to the case?

22         MR. KOUSOUROS:  Your Honor, if there are that many

23  calls, it's going to require one review and then a

24  determination by the Government of what's related, what's not

25  related.  That is a difficult call.

Proceedings                                    15

1          THE COURT:  Well, the Government should consider

2    whether it would be -- whether it would make sense to turn

3    them over the way you turned the others over.  My only concern

4    was safety.

5          MR. KOUSOUROS:  Understood.

6          THE COURT:  You can make the determination which way

7    you want to go.

8          Now, there were motions in limine filed, but I don't

9    think we set a date to respond to each other's motions.

10         MS. LASH:  We have a date on Friday, September 1st.

11         THE COURT:  Okay.  Okay.  Never mind.  That works.

12         And Ms. Kellman, you make a reference to -- I'm

13    sorry, wrong lawyer.

14         Mr. Mazurek, you make reference to a court order

15    that your paralegal be permitted to bring the telephone and

16    laptop in.

17         MR. MAZUREK:  Yes.

18         THE COURT:  I take it that paralegal, just by

19    chance, has the same last name as the defendant?

20         MR. MAZUREK:  Yes.  That is by chance.  No relation

21    to the defendant.

22         THE COURT:  I didn't think so.

23         MR. MAZUREK:  It is pronounced Abreu, not Abreu.

24         THE COURT:  I'm sorry.  The paralegal or the

25    defendant?

```
                        Proceedings                      16
```

1        MR. MAZUREK:  I think both.  I only know about my

2   paralegal.

3            THE COURT:  Ms. Kellman.

4            MS. KELLMAN:  They are both pronounced the same.

5            THE COURT:  I'm sorry for mispronouncing the name.

6   It probably won't be the last time it happens, out of no

7   disrespect, just out of lack of memory.

8            MR. KOUSOUROS:  Your Honor.

9            THE COURT:  Yes.

10            MR. KOUSOUROS:  You may recall with respect to

11   providing Mr. Yu with a computer, you suggested that we amend

12   the order.  We arranged with the Government -- with the

13   Government's consent to get a computer, have it wiped, and

14   then loaded by the Government.  The MDC didn't want to accept

15   it without a court order.

16            THE COURT:  All right.

17            MR. KOUSOUROS:  So we circulated this with the

18   Government and they have no problem with the amended order.

19            THE COURT:  Is that correct, Ms. Lash?

20            MS. LASH:  Yes, Your Honor.

21            THE COURT:  Magistrate Bulsara is going to select

22   the jury.  Were the parties aware of that?

23            MS. KELLMAN:  Yes, Your Honor.

24            MR. MAZUREK:  Yes, Your Honor.

25            MR. KOUSOUROS:  Yes.

Proceedings                                        17

 1          THE COURT:  And is there any objection by any of the

 2   defendants to the magistrate judge selecting the jury?

 3          MR. MAZUREK:  Not as to Mr. Zhang.

 4          MS. KELLMAN:  Not as to Mr. Abreu.

 5          MR. KOUSOUROS:  Nor for Mr. Yu.

 6          MS. MOORE:  The magistrate has set a date for us to

 7   see him on Thursday.

 8          THE COURT:  And to talk about voir dire requests?

 9          MS. MOORE:  Yes.

10          MR. MAZUREK:  And we submitted voir dire requests

11   before court today, both parties.

12          THE COURT:  Did you put that on the docket sheet,

13   ECF?

14          MR. MAZUREK:  Yes.

15          THE COURT:  With regard to the outstanding issue

16   regarding a request for a Franks hearing, the parties had

17   suggested that they didn't wish to -- or wanted to await

18   whatever discovery they receive from the Government, Carlos

19   Senquiz or whatever production of documents before responding.

20   Do I have that right?

21          MR. KOUSOUROS:  Your Honor, that is what we had

22   together asked for.  And upon our receipt, though, of the

23   affidavits that the Court had requested on August 1st, I think

24   we did, all three of us, file, at least for now, responses

25   with respect to those affidavits.  But we would like to

Proceedings                                      18

1  receive the remaining materials in order to resolve the issue

2  so the record is as full as possible.

3          THE COURT:  All right.  Let me --

4          MS. KELLMAN:  One of the things that came up as a

5  result of the affidavits we received, there is a question as

6  to what it was Special Agent Lin knew and when he knew it,

7  according to the records we have, he was -- he began to work

8  on the case in December of 2019 as a joint investigation with

9  NYPD and received NYPD's files, according to their cooperator

10  or the informant at the time, that informant said that he

11  informed NYPD that this person had -- the person -- Mr. Yu had

12  told him that he had been the shooter the day after the

13  shooting and during the course of that following week.  So

14  there should be documentation in that file that was received

15  by Agent Lin to that effect, and while -- saying he didn't

16  know that he had said that he was the shooter, I can't imagine

17  given what we understand from his own 302 and from the

18  witness' testimony in the grand jury, it seems incredible that

19  he wouldn't have known that from what's in the file, so I have

20  asked to have that file produced.

21          THE COURT:  What file produced?

22          MS. KELLMAN:  The NYPD file.

23          THE COURT:  You have already asked for that before,

24  though; correct?

25          MS. KELLMAN:  Yes, but as a result of his affidavit --

Proceedings                                         19

1          THE COURT:  Hasn't everything regarding Senquiz been

2     ordered to be produced?

3          MS. KELLMAN:  I don't know if the file that was

4     received by Agent Lin was ordered to be produced, whatever he

5     received from the NYPD we should get.

6          MS. LASH:  Your Honor, I'm happy to respond to that.

7          MR. MAZUREK:  I'm sorry, before the Government

8     responds, with all due respect, since we may be talking about

9     some of the details related to a Franks hearing, may we ask to

10    exclude Special Agent Lin from the courtroom while we discuss

11    factual matters that may become the subject of an evidentiary

12    hearing?

13         THE COURT:  I don't see any problem with that.

14         MS. LASH:  No, Your Honor.

15         THE COURT:  Do you see any problem with that?

16         MS. LASH:  No, Your Honor, that's okay.

17         (Special Agent Lin exits the courtroom.)

18         THE COURT:  Ms. Lash.

19         MS. LASH:  Yes, Your Honor.  So in regard to the

20    question that Mr. Kousouros raised about the materials the

21    that the defense is still waiting for, I'm not aware of

22    materials that are outstanding for production.

23         In regard to what Ms. Kellman said, in May of this

24    year, the Government produced, in redacted form, the entire

25    NYPD case file.  There are no additional DD5s or attachments

Proceedings                    20

1    that we're aware of that Agent Lin reviewed when he joined the

2    case that exist in this NYPD file that we have not turned

3    over.

4              Separately, defense counsel has asked us to turn

5    over any notes or, you know, written memorandum from officers

6    who might have been present when Carlos Senquiz made

7    statements to the NYPD.  So what we have done is tried to

8    trace every officer that might have been present at the

9    meeting and reach out to them personally to request if they

10   have any material concerning anything that Mr. Senquiz might

11   have said, please send it to us.  I've personally spoken to

12   most of these officers and made this request.  We have

13   received nothing else in response.  So, at this time, you

14   know, we are not aware of any notes or files or something, you

15   know, that relates to what the defense's request is here.

16             MR. SER:  Judge, can I address some of the

17   materials?

18             THE COURT:  I'm sorry, not to go into great detail,

19   but wasn't this also the subject of an ex-parte request that

20   was authorized by the Court?

21             MR. SER:  Yes, Your Honor.  We still haven't

22   received materials pursuant to that yet.

23             THE COURT:  Well, the Government has said what

24   they've said.  You've made your request.  So I don't know what

25   we are going to do past that.

Proceedings                                                21

1          MR. SER:  Well, there are additional FBI materials

2     that we now know exist based upon the affidavit that was

3     filed.  One, we know that there was at least an April 13, 2021

4     interview of David Yu by Agent Lin that he identified in his

5     affidavit.  We had requested production of those materials

6     from the Government.  We do not have any of those materials

7     yet and those were related directly to Agent Lin's statement

8     in response to what we think are questions.  David Yu tells

9     him that he's aware that Carlos Senquiz had been reporting

10    that he had claimed to be the shooter of Xin Gu.

11          As we identify and state in our letter, based upon

12    the wording of the affidavit, that certainly appears

13    consistent with a response to a question posed during the

14    course of interrogation either by Agent Lin or by a joint task

15    force officer present or another FBI agent in the room.  We

16    don't have those materials.  They are now extremely relevant

17    and probative as to --

18          THE COURT:  What is it -- there's something referred

19    to in his affidavit that you want a copy of?

20          MR. SER:  Yes.  We want any reports, 302s, DD5s, or

21    handwritten notes.  If there's a recording of this interview

22    on April 13, 2021 at the time of David Yu's arrest, we are

23    asking for production of those materials because they are

24    directly probative as to the issue that we are raising in our

25    Franks motion, and that is what did Agent Lin know prior to

Proceedings                                    22

1    the May 3, 2021 affidavit in support of the search warrant

2    that he sought that day.  This interrogation or this interview

3    of David Yu occurred nearly a full month before that.  And as

4    the overall timeline suggests, he obtained the NYPD file in

5    January of 2020.  We know through the Government's briefing

6    previously on this matter that there were no fewer than three

7    separate meetings between NYPD and Carlos Senquiz, including

8    at least one, if not two with two Queens A DAs present.  We

9    know after those meetings, Agent Lin has at least one meeting

10   personally with David Yu in April of 2021 now, and then on

11   May 3rd he files his affidavit.

12          THE COURT:  So you want all of the materials from

13   the April 3rd interview of David Yu?

14          MR. SER:  Yes, April 13th, as well notes, Your

15   Honor, from any preparation meeting they had before putting

16   him into the grand jury of Carlos Senquiz.

17          MS. LASH:  Your Honor, the individual that Mr. Ser

18   is discussing, as defense well knows, is a Government witness

19   in this case.

20          On Friday, they will receive every statement that he

21   has made to law enforcement in connection with this case per

22   Your Honor's 3500 deadline.  The notes of this interview, the

23   text of this interview, it will all be turned over.

24          To Mr. Kousouros' point about what Agent Lin knew

25   and when he knew it, the affidavit couldn't be more clear.  It

Proceedings                                              23

1   says, "I did not include information concerning Mr. Senquiz's

2   statement to law enforcement claiming that CW-1 said he was

3   the shooter because I was unaware that Mr. Senquiz made those

4   statements to law enforcement.  They keep raising questions

5   about what was in the file and what did Agent Lin know, when

6   he knew it.  This is his sworn testimony, the same testimony

7   that he would offer if he took the witness stand.

8         THE COURT:  No.  But the question is is there an

9   interview that Mr. Lin was a part of on April 13th in which

10  David Yu said to him, in words and substance, I know Carlos

11  Senquiz is going around saying I did it.

12        MS. LASH:  Yes, Your Honor, and that's in paragraph

13  6 of Agent Lin's affidavit, when he talks about this

14  April 13th interview with David Yu, when he says that he

15  heard -- what he said was he heard people were going around

16  saying that he did it.  When the agent asked who was saying

17  that, he said a person that he knew by the alias LB, who law

18  enforcement know --

19        THE COURT:  And that's Senquiz.

20        MS. LASH:  Yes.

21        THE COURT:  It's clear from his affidavit on

22  April 13th he had that information such as it was.

23        MS. LASH:  He had that information from David Yu who

24  had said people are going around saying this about me and it's

25  not true.  The question that Your Honor asked us to answer was

Proceedings                                    24

1   did Agent Lin know whether Senquiz had made these statements

2   to law enforcement and the answer to that is no.

3          THE COURT:  But you're not disputing that he knew --

4   on April 13th, that David Yu -- for whatever significance this

5   has one way or the other, that David Yu told him -- told them

6   that Senquiz was going around saying this, but it wasn't true?

7          MS. LASH:  Yes, that is laid out explicitly in

8   paragraph 6 of his affidavit.

9          THE COURT:  All right.  So you can make whatever

10  argument you want to make about that.  It's not something

11  that's disputed.

12         MS. KELLMAN:  Your Honor, one of the problems that

13  we're having -- a few of the -- one of the problems that we're

14  having is in Agent Lin's affidavit he specifically says he was

15  aware that Carlos Senquiz had made this statement that David

16  Yu was the shooter, but if he had the entire file there have

17  to have been reports in there given what the Government

18  believed was true when they put Mr. Senquiz in the grand jury

19  months later and he said that I went into NYPD the next day

20  and I told them that David Yu told me he was the shooter.

21         And by the way, we have asked for written memos and

22  the like.  We haven't asked for recordings.  And I have very

23  limited experience with the State, but I know when they

24  interview people who come in, my experience is that they

25  record everything that's said.

Proceedings                          25

1          THE COURT:  What are we talking about now, Ms.

2    Kellman?  Are you talking about something you haven't gotten

3    or an attack on the truthfulness of the affidavit?

4          MS. KELLMAN:  I'm questioning the truthfulness of

5    the affidavit.

6          THE COURT:  All right.

7          MS. KELLMAN:  Because if what the agent says is I

8    have no idea that he said he was the shooter, but the

9    individual is saying I went in there day one -- and that was

10   February 13, 2019 -- and I told them that David Yu told me he

11   was the shooter.

12         THE COURT:  Well, wait a minute.

13         MS. LASH:  Your Honor, that's not accurate.  On

14   February 13th, a confidential informant said that Senquiz said

15   something else.  Senquiz never walked into the NYPD on

16   February 13th.  All of these facts have been briefed and laid

17   out in the motions.  And I made a representation in my

18   affidavit, as did Special Agent Lin, that he reviewed the NYPD

19   file and this is what he knew when.  I understand that defense

20   counsel believes that there's something included in the NYPD

21   file that we didn't turn over.  We've turned over the entire

22   ECMS file.  I have called the officer and asked him if he did

23   not include any notes or memos in the file to send them to me.

24         THE COURT:  Fine.  I have one additional question,

25   Ms. Lash, I wanted to inquire of you.  The statement was that,

Proceedings                                        26

1   in effect, the events as to the shooter that David Yu's

2   testimony was credited and Senquiz's testimony was not

3   credited because it wasn't corroborated.

4        MS. LASH:  Senquiz's testimony concerning the role

5   that David Yu played in the shooting.

6        THE COURT:  Then the question is -- and I think it's

7   a legitimate question for defense to ask is why was he put in

8   the grand jury and testified to the fact that it was David Yu

9   who did it if he is somebody not to be believed?

10        MS. LASH:  Your Honor, putting Mr. Senquiz in the

11   grand jury was intended to put the text messages and

12   authenticate the text messages in the grand jury.  I

13   understand -- I'm the assistant that put Mr. Senquiz in the

14   grand jury and I understand that I asked him the question what

15   did you understand this to mean.  And he, you know, told me

16   that he understood that, by showing him the video, David Yu

17   was communicating that he was the shooter.  The purpose of

18   putting him in the grand jury was not to elicit that statement

19   despite the fact that he certainly said it in the grand jury.

20   The purpose was to authenticate the text messages.

21        MR. MAZUREK:  Judge, may I respond?

22        THE COURT:  Wait a minute.  Hold on.  Well, there is

23   another question on page 10 of the testimony.

24        "Did you meet him that day at the projects, I think;

25   is that correct?

Proceedings                                                27

1          "Yes.

2          "What did Potato tell you with regard to regard to

3    the shooting?"

4          And the answer, which seems to be in response, is

5    "He didn't tell me much other than he was the one that was

6    behind the shooting."  And that's the second time that he says

7    that in the grand jury.

8          MS. LASH:  Your Honor, I will just respond to that

9    by saying the language involving people's roles in this case,

10   you know, he -- Mr. Yu has never disputed that he was involved

11   in the shooting, that he participated in it, and I suspect

12   what we have here is a misinterpretation of the information

13   that the witness provided to Mr. Senquiz and assumptions were

14   made.  The fact remains that when Mr. Senquiz gave us this

15   information, the Government was meeting with and speaking to

16   this witness.

17         THE COURT:  Which witness?

18         MS. LASH:  Mr. Yu.

19         Mr. Yu is the source of this information.  So we

20   were getting the information directly from the source.

21         What Mr. Senquiz was talking about was secondhand

22   information provided by Mr. Yu.  So when we say that we had

23   credited the information that Mr. Yu provided, which we did

24   and continue to do, he had given us details that other

25   witnesses in this case, unknown to him, had separately

Proceedings                                        28

1    corroborated.  The information that Mr. Senquiz provided,

2    obviously we knew its source.  It was from David Yu.  And it

3    was not from anything that he himself had seen or observed.

4    It was from information that he had gotten from a person that

5    we were already speaking to and getting information from.

6              MR. KOUSOUROS:  Your Honor, I'm sorry, on page -- on

7    page 9, on page 9, counsel says -- at line 12 -- "Did the

8    video depict the shooting of an Asian man in Queens in

9    February of 2019?"

10             "Answer:  Yes.

11             "Question:  Why did Potato send you that video?

12             "Answer:  To tell me that it was him that shot that

13   Asian man.

14             "Question:  Why did you understand that to be the

15   case?

16             "Answer:  When he sent it to me, he told me to take

17   a look at it to see if I could see him as the shooter and he

18   claimed I told him that."

19             And that's where the Government stopped him from

20   going any further.

21             We have all put witnesses on the stand to

22   authenticate a message, a phone; is that your phone?  Yes.

23   How do you know?  Because it's my phone.  I recognize it.

24   It's got my number.  Thank you.  Goodbye.

25             This entire transcript is eliciting this

Proceedings                                              29

1  information.  Now, my issue is different because everybody has

2  conceded that they knew exactly what Senquiz was told by David

3  Yu, and the other information.

4      I would add that you now know, based on the

5  affidavit, that omitted from the affidavit was the fact that

6  David Yu lied when he was initially spoken to and the fact

7  that they knew that he was part of a --

8      THE COURT:  What do you mean lie?  Is this something

9  new that you're telling me?

10     MR. KOUSOUROS:  The affidavit submitted by Agent Lin

11 says that when we first approached David -- I'm sorry, so many

12 Yus here -- when we approach Potato, he lied about any

13 involvement in the shooting and then he ultimately did fess

14 up.  That was also omitted.

15     My pint is -

16     THE COURT:  Well, do you think that had to be

17 included?

18     MR. KOUSOUROS:  I do.  I do.  When you take --

19     THE COURT:  There's very sparse case law on this and

20 no one has presented any authority to the Court on this issue,

21 but to what extent does *Brady* and/or impeachment material have

22 to be presented in an affidavit?  In other words, the

23 Government has a good faith belief that their witness is now

24 telling the truth.  What authority do you have that suggests

25 that the Government is required to provide all evidence in a

Proceedings                                              30

1    search warrant affidavit that would impeach that testimony?

2            In other words, what you just pointed out, it's

3    typical for a cooperating witness to come in and when first

4    interviewed by the Government to tell them that, you know,

5    they're perfectly innocent, they have no idea what they're

6    talking about, and then later on to come forth with what the

7    Government believes is an accurate story as to what happens.

8            Are you saying every time a cooperator comes into

9    the Government and first disclaims any knowledge of the crime

10   that that's something that must go in a search warrant

11   affidavit if the Government is relying on that cooperating

12   witness?

13           MR. KOUSOUROS:  Your Honor, to address your first

14   question, which I touched upon in my submission, there is no

15   rule that says all *Brady* material has to be put into a search

16   warrant affidavit.

17           You know, we had a Crime Stoppers report here that

18   two other fellows did it with photos along with that; we are

19   not talking about that.  No.  All *Brady* and Giglio material

20   does not to be put into a search warrant affidavit.

21           But just think about it in reverse.  Is it possible

22   that *Brady* material, under *Rajaratnam* and its progeny, that is

23   credible and probative evidence which allows the Court to

24   infer that the affiant omitted the information with reckless

25   disregard as to whether the omissions would mislead.  That's

Proceedings                              31

1    the standard in *Rajaratnam*.  It doesn't matter what we call

2    it.

3            THE COURT:  Which case is it that you are making

4    reference to?

5            MR. KOUSOUROS:  Well, I am citing, Judge, from a

6    decision written very recently by Judge Karas, *United States*

7    *versus Lahey*, at 967 F. Supp. 2d 698, and it's got a really

8    detailed analysis of how to approach this.

9            THE COURT:  Does it relate to a Franks hearing?

10           MR. KOUSOUROS:  Absolutely.

11           THE COURT:  It is *U.S. versus Lahey*?

12           MR. KOUSOUROS:  L-A-H-E-Y, 967 Fed Supp. 2d 698, and

13   it really -- it goes at length into some very interesting

14   issues with respect to this, one of which is what standard do

15   you use when there is an omission.

16           THE COURT:  What is the standard?  Is it if you put

17   the information back into the warrant would it change the

18   decision?

19           MR. KOUSOUROS:  Well, no.  That's part of it.  But,

20   first of all, there is an issue as to when it comes to

21   omissions whether you use an objective or a subjective

22   standard.  There is a split in the circuits.  The Second

23   Circuit in Rajaratnam seems to have indicated that it is a

24   hybrid, subjective/objective approach.  But as Judge Karas

25   quoted, we are distinguishing between a misrepresentation

Proceedings                                             32

1   especially and an omission, it is -- when it comes to the

2   related omissions, the question is whether they were made with

3   reckless disregard for the truth, and the question is -- and

4   this is quoting *Rajaratnam*, quote, Whether there is credible

5   and probative evidence which allows the Court to infer that

6   the affiant omitted the information with reckless disregard to

7   whether the omissions would mislead.

8           You know, in this case, whether it is *Brady*, whether

9   it's *Giglio*, whatever you want to call it, it is the nature of

10  the evidence; it is the import of the evidence that controls.

11  So whether or not you always have to include *Brady* or *Giglio*

12  material in a search warrant affidavit is not the question.

13          The question here is what is the totality of the

14  information.  So when Your Honor asks does the fact that a

15  cooperator first initially came in and denied complicity and

16  then admitted it, well, maybe that alone is not enough.  But

17  what do you have here?  You've got the fact that he walked in

18  before he cooperated and lied.  And then when confronted, he

19  fessed up.  But what he fessed up was that he was a lookout

20  and not a shooter.  Where, at the same time, you have Senquiz

21  who came in and told you not only that he admitted he was the

22  shooter, he sent me a video, he asked if I recognize him as

23  the shooter, he asked me for a gun in case there was

24  retaliation and told me he had to disregard the murder weapon

25  because he shot the guy.  So when you take the totality of all

Proceedings                                                    33

1   that information, is it *Giglio*?  Is it *Brady*?  I'm sure you

2   can call it any combination of the two, but that's not the

3   question.  The question is how do you leave that out of a

4   search warrant?

5        So when you look at the standard in Lahey and

6   Rajaratnam, which I quoted, I think it is a strong case.

7        And I will says Judge Karas -- it was a complicated

8   case and he did find there was a reckless disregard with

9   respect to the omissions.

10       And in answering your question, Judge, he says,

11  While the omission of each individual fact may not necessarily

12  lead to the conclusion that the affiant acted with reckless

13  disregard for the truth, the cumulative effect of all of the

14  omissions was to eliminate nearly every indicator detracting

15  from probable cause.  There was nothing left to put the

16  issuing judge on notice of the omitted facts.

17       So what you have here as per the assistant's

18  concession on August 18th, and just looking at the paperwork,

19  is they talked about it, the assistant who assisted and the

20  agent.  They had this information and they made a conscious

21  decision to omit all of it.

22       THE COURT:  To omit all of what?  To omit the

23  Senquiz information?

24       MR. KOUSOUROS:  The fact that he lied when he was

25  first interviewed, that he then fessed up, that when he did

Proceedings                                                         34

1   fess up, he said he was only a lookout.  You have the

2   contradictory information by Senquiz.

3           And I have to say this as well, if Senquiz was a

4   witness that they wanted to use against us and you ask the

5   Government for corroboration, they'd give you a list pages

6   long.  He gave us the phone.  He came in.  He's been

7   consistent.  He's never deviated from his story, as Ms. Lash

8   said.  He always maintained that.  He's got a relationship

9   with David Yu.  They were both members of Gorilla Stone.

10  There is a text message in one of the phone messages with the

11  constitution of Gorilla Stone.  There's a trust between

12  criminals.  You let that in.  With all due respect, I think

13  that there would be a strong argument that you would allowed

14  that in because that's the way that they would use that.

15          There's nothing wrong with Senquiz said except they

16  had their theory.  They believed their theory, and so they

17  decided that the issuing magistrate didn't need to know about

18  any of this stuff.  And I submit to you respectfully the

19  magistrate should have known about it.

20          MS. LASH:  Your Honor --

21          MS. KELLMAN:  There is very little I can add to

22  that.

23          THE COURT:  For a minute, I thought you were

24  including the magistrate in on this.

25          MS. KELLMAN:  There is very little I can add to it,

Proceedings                                                    35

1    but I think the one thing that helps pull this altogether, as

2    Mr. Kousouros put it together, are the dates, because the

3    dates are very telling.

4            Mr. Senquiz was first interviewed, I think first

5    interviewed, by Agent Lin on June 23rd.  Okay.  That was up at

6    Downstate facility, whatever, a state jail.

7            Several days later, he reduced his notes, which we

8    don't have, I assume he took notes when he was in the jail.

9    We don't have them.  He reduced his notes to a 302 dated

10   the 29th.

11           And on the 30th -- I'm sorry.  A month later, on

12   July 30th, the affidavit is submitted to the Mississippi

13   magistrate.

14           So we have the end of June they're listening to

15   Senquiz.  They're believing him.  They're writing a memo, a

16   302 that says here's where he tells us all about you being the

17   shooter.  We give that to the magistrate.  We don't tell him

18   anything -- we limit what we tell him.  We don't tell him

19   anything about Yu.

20           Then right after that, within five weeks after that,

21   they put Senquiz into the grand jury to tell his story.

22           Now, by the way, it's impossible for me to believe

23   between the June 29th 302 and the September 1st 302 that there

24   aren't additional 302.  It's impossible to imagine that the

25   U.S. attorney put this young man into the grand jury having

Proceedings                                    36

1   never prepared him since June 23rd.  So there have to have

2   been interviews between 23rd and the 1st.  But to say that

3   there is every reason that there are not only interviews, but

4   they believed what he said.  And what he said was the guy told

5   me he was the shooter, what he said was, he told me discharge

6   the gun -- dispose of the gun -- I'm sorry -- and asked me to

7   replace it.  He told me that -- he sent me a video.  We have

8   the text messages.  He sent me a video to see if I can tell

9   that he was the shooter.

10          All of this is happening within a timeframe, and

11  that timeframe is not favorable to the Government, because it

12  starts on June 23rd, and they put him in the grand jury on

13  September 1st, and it is July, right smack in the middle, when

14  they go to the magistrate and never mention a word about the

15  fact that they believe -- I don't care what Yu is telling them

16  because Yu is lying to them at some point and changing his

17  story at another point, but Senquiz has been consistent from

18  day one.

19          THE COURT:  Wait a minute.  You say Yu has been

20  changing his story, changing his story from an initial denial

21  that he was involved --

22          MS. KELLMAN:  Correct.

23          THE COURT:  -- to then his statement of how he was

24  involved and who else was involved.

25          MS. KELLMAN:  Then he also says that was -- part of

Proceedings                                          37

1    of that calculation was the fact that they kept telling him

2    about a needle, about the fact that he was facing the death

3    penalty.

4           THE COURT:  Who kept telling him about a needle?

5           MS. KELLMAN:  The agents.

6           MR. KOUSOUROS:  It's in my letters, Judge.

7           In one of the conversations that we have been

8    listening to, he calls his brother and he describes this

9    meeting and says they came to me, the Government came to me

10   and he expresses surprise, and he says I can't believe it,

11   they didn't even talk to me about the drugs, all they wanted

12   to know about was this murder, and they kept telling me I'm

13   going to get the needle, and I'm going to get the death

14   penalty.  He is talking about this.  It's one of the reasons

15   why I also asked, in my letter, that, you know, we should have

16   whatever 302s that are from that meeting and you should know

17   who else was there because whoever else was there must have

18   also helped in deciding what to put in, what not to put in.

19   This is what Ms. Kellman is talking about.  It's a jail call.

20          I just want to say one other thing because I forgot.

21   I think it is also important the fact that he testified in the

22   grand jury was not brought to the magistrate.

23          THE COURT:  That who testified?

24          MR. KOUSOUROS:  That Senquiz was put into the grand

25   jury.  That's another fact that I think should have been in

Proceedings                                          38

1    there.  This is a -- well, that's it.

2            MS. KELLMAN:  Here, Your Honor, there is a little

3    bit of a difference because -- different affidavits were

4    submitted to different magistrates at different times with

5    respect to the affidavit in Mississippi with respect to my

6    client's -- the ability to search my client's phone, that was

7    presented to the magistrate in Mississippi before Mr. Senquiz

8    went into the grand jury.  But a month after his initial

9    interview with Agent Lin -- and, again, I say if he

10   interviewed him on June 23rd --

11           THE COURT:  Wait a minute.  Just factually, are

12   there affidavits filed after Senquiz went into the grand jury?

13           MR. KOUSOUROS:  That's mine.

14           THE COURT:  That's yours.  Okay.  Got it.

15           MS. KELLMAN:  My client's is before, Your Honor.

16   But clearly there is an ongoing dialogue with Senquiz and

17   Agent Lin and the Government because ultimately, after they

18   submit this to the judge, they must continue to talk to

19   Senquiz because they just didn't put him in the grand jury

20   without having spoken to him for three months.  So what were

21   they talking about.  If they decided that he was telling the

22   truth about what he had been telling them for three months,

23   unless they believed it, they would never had put him in the

24   grand jury.

25           And if they believed what he was saying, what Yu was

1  saying was completely contrary.  So they made a choice on

2  September 1st to believe Senquiz by putting him in the grand

3  jury.

4           THE COURT:  Okay, I got that point.

5           MR. MAZUREK:  Judge, I'm sorry.  I will be brief.  I

6  do want to make mention that we are differently situated than

7  our co-counsel because of the timing of the affidavit of the

8  search warrant that we are seeking to suppress.  Our timing is

9  that the affidavit in support of the search warrant was

10  May 3rd of 2021.  And the reality here is that the standard

11  is, as my colleagues have correctly stated, the magistrate was

12  not given the information either intentionally by the agent or

13  in reckless disregard of the truth.  I think we can meet that

14  standard.

15           And by the way, Your Honor, we do rely on a recent

16  Second Circuit decision which actually reversed a decision by

17  the district court not to hold a Franks hearing when there

18  were a number of allegations of misrepresentations being made

19  in the application.  This is *United States versus Lauria,*

20  L-A-U-R-I-A.  The cite is 70 F.4th -- I can't believe we are

21  in F.4th already -- F.4th 106, and that decision was issued on

22  June 9th, 2023.  The opinion was Judge Raggi.

23           Your Honor, the reason why we need a Franks hearing

24  on the timeline --

25           THE COURT:  I don't know what we are going to

Proceedings                                    40

1    determine at a facts hearing.  The Government has already

2    admitted to the fact that they purposely didn't put it in

3    there.  We know the significance of the information.  We were

4    able to argue the significance of the information.

5              MR. MAZUREK:  But we're in a different time period.

6    So, as of May 3, 2021, the affidavit before the Court from

7    Special Agent Lin indicates that, according to his affidavit,

8    he was unaware at the time of the May 2021 affidavit he

9    submitted to the magistrate that Senquiz had made those

10   statements to law enforcement officers.

11             Now, today, in court, the Government is saying well,

12   what the April 13, 2021 interview between Lin and David Yu

13   will show, once we get the 3500 material on Friday, is that

14   David Yu told Agent Lin on April 13th -- that's, in my

15   calculation, about three weeks before he submits this

16   affidavit to Magistrate Kuo in this court -- that Senquiz was

17   telling people that Yu said I was the shooter, and he's

18   denying that.

19             THE COURT:  We have those facts.  You can argue from

20   those facts if that's what these are going to show.  You can

21   argue from those facts that's what the case is and that he

22   should have done something else.  I still don't know why, in

23   light of the affidavits, that we need a hearing.  These are

24   all facts the Government is not going to dispute.

25             MR. MAZUREK:  Well, I mean, there is a black and

Proceedings                                                           41

1    white -- if we go before another court someday, to the Second

2    Circuit, there is going to be in the record, at paragraph 7,

3    in a sworn affidavit by Christopher Lin that said that I was

4    unaware that Senquiz had made those statements to law

5    enforcement officers at the time he drafted this affidavit.

6            I should be able to cross-examine Agent Lin to say

7    well, wait a minute, because the record is not clear here,

8    that on April 13, 2021, you interviewed David Yu.  You took

9    him in.  You arrested him on narcotics charges and you had a

10   belief that he was involved in a murder in February of 2019,

11   and when you had that interview with him -- first of all, I

12   question -- you know, I don't have the material yet, but I

13   question that whether David Yu, when he's first contacted by

14   law enforcement, arrested on a drug charge, is saying to these

15   officers, sua sponte, out of the blue, that oh, people are

16   telling that I was the shooter; I wasn't the shooter.  I find

17   that very hard to believe.  But we will see what --

18           THE COURT:  Let me ask you something.  Since this

19   April 13th relates directly to issues that are going to have

20   to be resolved in the Franks hearing, I want you to turn over

21   that material before Friday, okay?  So we're not sitting here

22   on Friday with counsel making other arguments.  It will give

23   them time to address that.  So if you can turn over that

24   tomorrow.

25           MS. LASH:  Yes, Your Honor.

Proceedings                                            42

1          MR. MAZUREK:  Then the other question is, Your

2     Honor, even if that comes up, okay, on April 13, 2021, Agent

3     Lin is aware that Carlos Senquiz told law enforcement that --

4     that David Yu said he was the shooter.  He put it in his

5     affidavit of May 3rd that he's relying on statements by Carlos

6     Senquiz that were made to NYPD on May 1st, May 1, 2019.

7          So, on May 3, 2021, we are in a situation where he

8     is filing an affidavit, sworn under oath, giving all of the

9     information to a neutral magistrate to make a determination of

10    whether there's probable cause to believe that my client was

11    involved in this shooting to get his cell site location

12    information and he doesn't -- he includes all the information

13    about the statements that Carlos Senquiz made to NYPD, but he

14    leaves out the fact that oh, and by the way, Senquiz also said

15    he was the shooter, that David Yu was the shooter.

16         He just interviewed David Yu less than three weeks

17    before and David Yu -- I mean, as the Government is saying --

18    apparently told him Carlos Senquiz said I was the shooter.

19    How can he not include that information in the affidavit just

20    three weeks later?

21         And the timing makes a huge bit of difference in our

22    case because at that point in time, on May 3, 2021, there is

23    no other probable cause.  The only information they have is

24    Senquiz and they have David Yu.  They have some information,

25    you know, from CS-3, this guy Chris Nguyen who said that Abreu

Proceedings                                    43

1   potentially.

2           Confessed to him at a party in New York, but that

3   doesn't impact my client.

4           So the probable cause with respect to Zhe Zhang is

5   almost entirely -- I've read this a million times -- the May

6   three, 2021 affidavit is reliant on David Yu and the fact that

7   the agent --

8           THE COURT:  But what it is that you're contending

9   that is wrong is a statement made by Abreu, that that is what

10  is false?

11          MR. MAZUREK:  No, no, no.  I'm sorry.  That's the

12  only other probable cause showing, CS-3.  I didn't mean to

13  confuse.

14          THE COURT:  No.  But why it is that you say there is

15  a false statement here is because you say it wasn't made known

16  that Yu was saying Senquiz was saying that he was the shooter.

17  But you just said that in that affidavit there was a statement

18  from another individual that said Abreu was the shooter, or do

19  I have that wrong?

20          MR. MAZUREK:  Was involved in the murder, indicated

21  that he was involved in the murder.

22          That Abreu and You You carried out the shooting on

23  Yu.  It doesn't say who actually does the shooting.  But You

24  You and Abreu -- it says, in paragraph 26 of that affidavit,

25  CS-3 understood Abreu and You You to have carried out the

Proceedings                                              44

1    shooting on February 12, 2019.

2             THE COURT:  But that's additional information in

3    that particular affidavit.

4             MR. MAZUREK:  It does.  But it doesn't mention Mr.

5    Zhang.

6             What I'm saying is that the only information for a

7    probable cause showing to get my client's information that was

8    seized pursuant to a Fourth Amendment was per the credibility

9    of David Yu saying that Zhang was involved in this murder.

10            THE COURT:  Right.

11            MR. MAZUREK:  And the fact that he knew, that Agent

12   Lin knew -- he has had one interview as far as we know --

13            THE COURT:  I understand your argument.  It's

14   clearly made.

15            The only thing I'm saying is the one thing that you

16   say that he lied about is the one thing that in that same

17   search warrant affidavit is corroborated by another witness.

18            You're saying he can't be believed generally because

19   he lied about who the shooter was.  And to the extent he said

20   anything about your client, that also make him incredible

21   about your client.

22            All I'm saying is that you say the one thing that he

23   was not being candid about also happens to be the one thing

24   that was corroborated in that same warrant affidavit.  I know

25   you're not arguing that.

Proceedings                                                      45

1          MR. MAZUREK:  I'm not conceding that even because it

2    doesn't say that.  It says these two people to have been

3    involved in the shooting.

4          MS. KELLMAN:  If I could just add very, very

5    briefly.

6          THE COURT:  Is it something I haven't heard before,

7    Ms. Kellman?

8          MS. KELLMAN:  Just to underscore, based on the new

9    information you just heard, the bottom-line is the Government

10   still -- all these conversations notwithstanding on May 3rd --

11   the Government still continued to interview Mr. Senquiz and

12   made a determination that they were going to ask him about who

13   the shooter was in the grand jury.

14         THE COURT:  Yes, I understand that.

15         Just briefly, does the Government want to respond to

16   anything new that's been raised?

17         MS. LASH:  Yes, Your Honor, very briefly.

18         THE COURT:  Okay.

19         MS. LASH:  First of all, as to Mr. Abreu, when you

20   read the warrant, Your Honor, there are three separate sources

21   unrelated to Mr. Yu that implicate Mr. Abreu in the murder.

22         THE COURT:  In which warrant are we talking about?

23         MS. LASH:  In the Abreu phone warrant.  So even

24   exercising Mr. Yu's information entirely from the warrant,

25   there's material probable cause as to his involvement.

Proceedings                                    46

1          THE COURT:  What is that?

2          MS. LASH:  Excuse me?

3          THE COURT:  What is that?

4          MS. LASH:  What is what?

5          THE COURT:  What is the material information after

6     you take David Yu's information out that suggests that Mr.

7     Abreu is involved?

8          MS. LASH:  There are three sources in the warrant.

9     We cite CW-2  who observes Mr. Abreu cleaning the car that is

10    similar to the get-away vehicle with a temporary license plate

11    wearing blue or purple gloves as the shooter is wearing in the

12    video during the murder.

13         There is another individual who is a cooperating

14    witness that talks about how Abreu confessed to him to the

15    shooting and said, That's me in the video shooting the victim.

16         THE COURT:  What paragraph is that?

17         MS. LASH:  That's paragraph 24, Your Honor.

18         THE COURT:  Okay.

19         MS. LASH:  And then there is a third confidential

20    source in the warrant that corroborates the first source that

21    I discussed, talking about how Mr. Abreu was driving the type

22    of car that was used as the get-away vehicle with a temporary

23    license plate and he further admitted to this source that he

24    was involved in something in Flushing, which the source

25    understood to be the murder of the victim.

Proceedings                    47

1        Separate and apart from the source information in

2   the warrant --

3        THE COURT:  You're talking about Mr. Abreu's warrant

4   now?

5        MS. LASH:  Mr. Abreu's warrant, yes.

6        -- there is information connecting Mr. Abreu to the

7   use of temporary license plates that was used on the get-away

8   car in the murder both in the weeks before the murder and

9   after the murder.

10        THE COURT:  Was that in the affidavit?

11        MS. LASH:  Yes, Your Honor.

12        THE COURT:  Is there anything else that you wanted

13   to add?

14        MS. LASH:  Paragraph 27 through 29.

15        Yes, Your Honor.  When we move to the Mr. Yu

16   warrant, if you look at the probable cause and the

17   corroboration for the information that David Yu, CW-1

18   provided, this is discussed in the Lin affidavit in paragraph

19   10, there is the surveillance video depicting the vehicles

20   that Mr. Yu describes as being involved in the murder,

21   including the path taken by the vehicle that Mr. Yu drove that

22   night, which was out of sight of the white sedan --

23        MR. KOUSOUROS:  Your Honor, I'd like to --

24        THE COURT:  Please don't interrupt her.

25        MR. KOUSOUROS:  Just for the record, instead of Mr.

Proceedings                                              48

1    Yu, can you just say David Yu because my client is Mr. Yu.

2              THE COURT:  Okay.

3              MR. KOUSOUROS:  I'm sorry, Judge.

4              MS. LASH:  Your Honor, additionally, there are --

5    there's documentation from a rental car company where this

6    white van was rented several hours before the murder.  That

7    information came from Mr. David Yu himself.

8              Separate and apart from the information that Mr.

9    David Yu provided, there are bank records showing the payment

10   from Allen Yu to defendant Zhe Zhang.  There is a text message

11   from Mr. Zhang to Mr. Abreu 20 minutes after the murder

12   indicating that they were together at the time of the murder.

13             MR. MAZUREK:  That's not true.  That's not true.

14   That's a misstatement.

15             THE COURT:  Please, please.

16             MR. MAZUREK:  That's just --

17             THE COURT:  Just wait and let counsel finish so we

18   can go back and forth until tomorrow morning sometime.

19             Go ahead.

20             MS. LASH:  Your Honor, there is cell site data

21   showing Mr. Zhang in the proximity several hours before the

22   murder.

23             There is additional cell site data and witness

24   testimony where Mr. David Yu noted where Mr. Zhang was in the

25   days following the murder that is corroborated by the cell

Proceedings                                        49

1    site data and other witnesses.

2          I've talked about the sources and the documentary

3    evidence connecting Mr. Abreu to the get-away vehicle and his

4    confession to a cooperating witness as to being the shooter.

5    All of this information is included in the affidavit that Mr.

6    Allen Yu is challenging here as not containing probable cause.

7          While Mr. David Yu puts Mr. Allen Yu at the center

8    of this conspiracy.  All of the rest of the information that

9    Mr. David Yu provided is corroborated by all of these separate

10   sources.

11         So even if Your Honor finds that this was an

12   omission and considers it not a reasoned judgement, there is

13   material probable cause in these warrants that would allow

14   them to stand on their own.

15         THE COURT:  All right.  Thank you.

16         Mr. Mazurek, I will just allow you to address what

17   you said was a misstatement and that will be the end of it.

18         MR. MAZUREK:  So that there's nothing in the

19   affidavit to show that there was a text message between Abreu

20   and my client's cell phone that indicated that they were

21   together that night.  The text message reads, Hey, bro, hit

22   me, I left something in there.  That's all it reads.  There's

23   nothing more and nothing less.

24         And there's no indication through cell site data

25   that they were together, that those two phones were together

Proceedings                                          50

1    at any point that night.  The only cell site data that the

2    Government had -- and, by the way -- I don't even know what

3    I'm talking about.  There's no cell site data in the May 3,

4    2021 application because that's what they were seeking through

5    the search warrant, the cell site location information for my

6    client.  You can say that is a misstatement as well because

7    they didn't have cell site data of my client at that point in

8    time.  I don't even think they had pinging information on

9    May 3, 2021.  So that's a misstatement.

10           MS. LASH:  To be clear, Your Honor, all of the list

11   that I gave was in responses to Mr. Kousouros's arguments

12   about the omission in Mr. Allen Yu's premises warrant.

13           MR. MAZUREK:  There is none of that probable cause

14   showing in the May 3, 2021 affidavit.  They are reliant

15   exclusively on David Yu and they made a determination to

16   include Yu rather than Senquiz's statements --

17           MS. KELLMAN:  And I find myself similarly situated.

18           THE COURT:  Fine.  Thank you.

19           I take it Government the Government is going to

20   respond -- you haven't responded yet to the attack on the cell

21   site expert yet.

22           MS. LASH:  Your Honor, we understood that our

23   responses to the motions in limine would be due Friday,

24   September 1st.

25           THE COURT:  It makes no sense going into that.

Proceedings                                                        51

1          MR. MAZUREK:  Your Honor, I'm sorry.  I may have

2    missed it.  When did you say we should get the April 13, 2021

3    interview notes?

4          THE COURT:  Tomorrow.

5          MR. MAZUREK:  Thank you.

6          One other thing that I would request.  There's an

7    indication in the May 3, 2021 Lin affidavit that he had

8    submitted an affidavit in support of a warrant to get the

9    phone contents of David Yu upon David Yu's arrest I imagine on

10   April 13, 2021, which would have been just three weeks before

11   the affidavit for Zhe Zhang's cell site location information.

12   We would ask that that be produced as well to make a

13   determination of what he told the magistrate with respect to

14   Carlos Senquiz in that affidavit which predated the May 3rd --

15         THE COURT:  If you've got a separate request of

16   information that you want from the Government, spell it out in

17   a letter to them and make it specific if this is what you

18   want, if this is something that you have not previously

19   requested.

20         MR. MAZUREK:  Okay.

21         THE COURT:  We have another -- we will have another

22   conference on September 8th and hopefully we will be able to

23   tie up all of these loose ends.

24         MR. MAZUREK:  Judge, since we have all of these

25   loose ends, we are still waiting for 3500 material.  I know

Proceedings                                                    52

1   that you said that we can come back on September 8th and make

2   the request that -- we will pick a jury on September 11th --

3   can we open on September 18th?  Just for our planning

4   purposes.  I think we've made a fairly good showing here that

5   we are being as diligent as we can as defense counsel in

6   trying to prepare for this very complicated trial with lots of

7   different materials in different forms.  I would ask that

8   again.

9           I do note also I don't even think it's asking for

10  that much.  It really only asking for two, maybe three trial

11  days because I think we're not going to have a jury until

12  September 12th.  You can call me crazy.  September 15th is

13  Roshanna.  The Court has already indicated that you would not

14  be sitting on that day.  So we're really only talking I think,

15  in my mind, the 13th and 14th.  I would ask that we can have

16  those days to complete our preparation, to review the 3500

17  which is coming our way and have opening statements on

18  September 18th.

19          THE COURT:  Okay.

20          MR. MAZUREK:  Yes?

21          MR. KOUSOUROS:  That's a yes?

22          THE COURT:  Yes.  Wasn't that easy?

23          MR. MAZUREK:  That was easy.

24          MS. KELLMAN:  So if I ask for the 25th --

25          THE COURT:  You always get piggy towards the end.

Proceedings                                                53

1   You're never satisfied.  You go that extra mile every time you

2   get a chance.  No.

3           Okay.

4           MR. KOUSOUROS:  Thank you, Judge.

5           MR. MAZUREK:  Thank you.

6           MS. LASH: Thank you

7           (Matter concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25